## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CASE NO.  10-10939** |
| **MICHAEL J. DOWNEY** | ) | |
| **CONNIE L. DOWNEY** | ) | **MOTION FOR RELIEF FROM STAY** |
| SSN: xxx-xx-6261 | ) | |
| SSN: xxx-xx-5117 | ) | **APPLYING 11 U.S.C. § 362(e)** |
| | ) | |
| DEBTORS | ) | |

Pursuant to Section 362(d) and 1322(c)(2) of Title 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code") and Bankruptcy Rules 4001 and 9014 KONDAUR CAPITAL CORPORATION (KCC), through counsel, hereby moves the Court for an Order for relief from the automatic stay provisions of 11 U.S.C. §362(a).

In support of its Motion, KCC shows unto the Court that:

1.  On or about August 9, 2010, the Debtors filed a petition with the United States Bankruptcy Court for the Western District of North Carolina for relief under Chapter 13 of the United States Bankruptcy Code.

2.  This Court has jurisdiction over the Motion pursuant to the provisions of 11 U.S.C. §362 and Bankruptcy Rules 4001 and 9014.  This Court has jurisdiction over this proceeding, pursuant to 28 U.S.C. §1334 and the Referral Order entered herein by the Chief United States District Court Judge for the Western District of North Carolina and 11 U.S.C. §362.  Bankruptcy Rules 4001 and 9014 apply.  This matter is a core proceeding as defined in 28 U.S.C. §151 and 157(b) and to the extent any non-core issues are raised, KCC consents to the jurisdiction of this Court for determination of all issues, including non-core issues.

3.  David G. Gray is the duly appointed Trustee in the Debtors' Chapter 13 proceeding.

4.  On or about February 9, 2007, Michael J. Downey, Sr. executed a Deed of Trust Note ("Note") in the original principal amount of $650,000.00, a copy of which is attached hereto and incorporated herein by reference. Upon information and belief, said Note was modified pursuant to the terms of the attached loan modification agreement dated May 13, 2009.

5.  The Note referred to in the preceding paragraph is secured by a Deed of Trust on real property owned by the Debtors and known as 107 New View Drive, Burnsville, North Carolina and more particularly described in a Deed of Trust recorded in Book 546, Page 519, Yancey County Registry, North Carolina.  A copy of the Deed of Trust is attached hereto and incorporated herein by reference.

6.  Upon information and belief, the Debtors have further encumbered the secured property as evidenced by a second (2nd) Deed of Trust recorded in the Yancey County Registry, North Carolina in the unpaid balance of $90,000.00, in favor of PNC Mortgage, a division of PNC Bank, N.A.

7.  The basis for this Motion is that on or about, June 1, 2011, the loan will mature. Pursuant to the terms of the loan modification agreement, amounts still owed under the Note, will be paid in full on that date, which is called the "maturity date".

8.  KCC is a secured creditor in the Debtors' bankruptcy proceeding.  Pursuant to the Debtors' Chapter 13 Plan, KCC will be paid by ongoing disbursements from the Chapter 13 Trustee subsequent to August 9, 2010.

9.  As of the filing of this Motion, the pay-off on the Note owed to the Creditor from the Debtors is in excess of $650,000.00 (unpaid principal balance), plus interest and other reasonable fees and costs as provided for in said Note.

10.  A fair market value, based on the Debtors' Petition is $700,000.00. The current tax value based on the Yancey County Tax Appraiser is $690,230.00.

11.  The property securing the obligations of the Debtors to KCC is not necessary for an effective reorganization.

12.  Movant is not adequately protected and the Debtors have not offered adequate protection.

13.  Movant is entitled to Relief from Stay to foreclose its security interest in the property identified in the Deed of Trust attached hereto and incorporated herein by reference.

14.  Movant will suffer irreparable injury, loss and damage in the event relief is not granted.

15.  Movant has incurred reasonable attorney's fees and costs in connection with the prosecution of this motion.

BASED UPON THE FOREGOING, Movant respectfully prays that:

1.  The stay imposed by 11 U.S.C. §362(a) be terminated, annulled or modified to permit Movant to foreclose its security interest in the property identified in the Deed of Trust attached hereto; that said relief is immediate, and the waiting period of F.R.B.P. 4001(a)(3) does not apply; or in the alternative that it receive adequate protection from the Debtors;

2.  The hearing of this motion be the final hearing under 11 U.S.C. §362(c) and any preliminary hearing be consolidated herein and Orders entered accordingly;

3. It be granted reasonable attorney's fees pursuant to 11 U.S.C. §506; and,

4. It have such other and further relief as the Court deems just and proper.

This the 18th day of May, 2011.

THE LAW FIRM OF HUTCHENS, SENTER & BRITTON, P.A.

BY: s/Joseph J. Vonnegut
    Joseph J. Vonnegut
    Attorney for Movant
    4317 Ramsey Street
    Post Office Box 2505
    Fayetteville, NC 28302
    (910) 864-2668
    State Bar No. 32974

THIS IS A COMMUNICATION FROM A DEBT COLLECTOR. THE PURPOSE OF
THIS COMMUNICATION IS TO COLLECT A DEBT AND ANY INFORMATION
OBTAINED WILL BE USED FOR THAT PURPOSE.

------------------------------------[Space Above This Line For Recording Data]------------------------------- 

# LOAN MODIFICATION AGREEMENT
### (Interest Only, Variable Rate based on Prime)

This Loan Modification Agreement ("Agreement"), made **MAY 13, 2009**, between **MICHAEL J DOWNEY SR JOINT TENANCY CONNIE DOWNEY ("Borrower(s)")** and National City Mortgage Co., a Subsidiary of National City Bank ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument"), dated **FEBRUARY 9, 2007** and recorded in **YANCEY** County, State of **NORTH CAROLINA** (2) the Note bearing the same date as, and secured as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property," located at     107 NEWVIEW DR ( NEW 94 ADDRESS)

877 COXES CREEK ROAD
BURNSVILLE, NORTH CAROLINA 28714
(Property Address)

the real property described being set forth as follows:

## SEE ATTACHED LEGAL DESCRIPTION

All capitalized terms defined in the Note will have the same meaning in this Agreement.

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. **BORROWER'S PROMISE TO PAY**

    As of **MAY 13, 2009**, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is **SIX HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS (U.S. $650,000.00)** consisting of the amount(s) loaned to the Borrowers by the Lender and any interest capitalized to date.

2. **INTEREST**

    Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender as follows: Beginning **JUNE 1, 2009**, Borrower will pay interest at a yearly rate of **3.250%**. The interest rate Borrower will pay may change in accordance with Section 4 of this Agreement.

    The interest rate required by this Section 2 and Section 4 of this Agreement is the rate Borrower will pay both before and after any default described in the Note.

3. **PAYMENTS**

    **(A) Time and Place of Payments**

    Borrower will make monthly payments on the first day of every month, beginning **JULY 1, 2009**. Borrower will make these payments every month until all principal and interest and other charges owed under the Note are paid in full. Before the Maturity Date (defined below), Borrower's payments will consist only of the interest due on the Unpaid Principal Balance of the Note. No payments of principal are scheduled before the Maturity Date.

Payments consisting only of interest due will not reduce the Unpaid Principal Balance. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before principal. If, on **JUNE 1, 2011**, Borrower still owes amounts under the Note, Borrower will pay those amounts in full on that date, which is called the "Maturity Date."

Borrower will make monthly payments at **National City Mortgage Co., P. O. Box 1820, Dayton, OH 45401-1820** or at a different place if required by the Note Holder.

**(B)  Amount of Borrower's Monthly Payments**

Borrower's monthly payment will be in the amount of U.S. **$1,760.42** until the first Change Date (defined below). After the first Change Date, Borrower's monthly payment may change in accordance with Section 3(C) and Section 4(C)(ii) of this Agreement.

**(C)  Monthly Payment Changes**

Changes in Borrower's monthly payment will reflect changes in the Unpaid Principal Balance and in the interest rate that Borrower must pay. The Note Holder will determine Borrower's new interest rate and the changed amount of Borrower's monthly payment in accordance with Section 4 of this Agreement. Borrower's payment may also change if Borrower makes a partial prepayment of principal. The Note Holder will deliver or mail to Borrower a notice of the change as provided in the Note.

**4.      INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**

The interest rate Borrower will pay may change on **AUGUST 1, 2009** and on the 1st day every month thereafter. The date on which Borrower's interest rate above could change is called a "Change Date."

**(B)  The Index**

Beginning with the first Change Date, Borrower's interest rate will be based on an Index. The "Index" is the Prime Rate as published in *The Wall Street Journal*, it being acknowledged that the Prime Rate is not necessarily the lowest rate of interest then available from Lender on fluctuating-rate loans. The most recent Index figure available as of each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C)  Calculation of Changes**

On each Change Date, the Note Holder will calculate Borrower's new interest rate by adding **ZERO** percentage point(s) **(0.000%)** to the then Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be Borrower's new interest rate until the next Change Date.

For the monthly payments due after the first Change Date, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay all accrued interest each month on the Unpaid Principal Balance at the related Change Date at the new interest rate determined above. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of Borrower's monthly payment changes again.

**(D)  Limits on Interest Rate Charges**

Borrower interest rate will never be greater than **10.500%**.



**5.    BORROWER'S RIGHT TO PREPAY**

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When Borrower makes a Prepayment, Borrower will tell the Note Holder in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly payments due under the Note.

Borrower may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use Borrower's Prepayments to reduce the amount of principal that Borrower owes under the Note. However, the Note Holder may apply Borrower's Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying the Prepayment to reduce the principal amount of the Note. If Borrower makes a partial Prepayment, there will be no changes in the due date of Borrower's monthly payment unless the Note Holder agrees in writing to those changes.

Any reduction in the amount of the monthly payment due to a partial Prepayment may be offset by an interest rate increase.

**6.**    If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**7.**    Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument.

**8.**    Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement; provided that any addendum to the Note pertaining to the interim construction financing is null and void and of no further effect as of the date of this Agreement.

9.    BORROWER HEREBY ACKNOWLEDGES AND AGREES TO PAY ALL AMOUNTS OUTSTANDING UNDER THE NOTE, AS MODIFIED HEREIN, ON OR BEFORE THE MATURITY DATE. BORROWER FURTHER ACKNOWLEDGES AND AGREES THAT LENDER IS NOT OBLIGATED AND DOES NOT AGREE TO ANY OTHER OR FUTURE AMENDMENTS, EXTENSIONS OR CONVERSIONS AND THAT THIS AGREEMENT DOES NOT CREATE A COURSE OF DEALING BETWEEN BORROWER AND LENDER.    BY SIGNING BELOW, BORROWER HEREBY IRREVOCABLY WAIVES ALL DEFENSES AND COUNTERCLAIMS AGAINST LENDER AND ITS OFFICERS, DIRECTORS, AFFILIATES, SUBSIDIARIES, PARENTS, REPRESENTATIVES, AGENTS, SHAREHOLDERS, ATTORNEYS, EMPLOYEES, PREDECESSORS, SUCCESSORS AND ASSIGNS (COLLECTIVELY THE "RELEASED PARTIES"), AND FULLY, FINALLY AND IRREVOCABLY RELEASES THE RELEASED PARTIES FROM ANY AND ALL DEFENSES, COUNTERCLAIMS, OFFSETS, CROSS-CLAIMS, CLAIMS, CAUSES OF ACTION, DAMAGES AND DEMANDS OF ANY KIND OR NATURE, KNOWN OR UNKNOWN, KNOWABLE OR UNKNOWABLE, EXISTING AS OF THE DATE OF THIS AGREEMENT ARISING OUT OF OR RELATING TO THE INTERIM CONSTRUCTION LOAN AND ANY OF THE LOAN DOCUMENTS RELATED THERETO AND THE CONSTRUCTION OF THE RELATED IMPROVEMENTS. BY SIGNING BELOW, BORROWER WARRANTS THAT ALL INFORMATION PROVIDED TO VERIFY ABILITY TO REPAY THE NOTE, AS MODIFIED HEREIN, IS ACCURATE AND WAS NOT ALTERED OR FALSIFIED IN ANY MANNER.



Lender National City Mortgage Co., A Subsidiary of
National City Bank

Witness:_____     By:_____(Seal)
                                           Authorized Signature

Witness:_____     Its:_____
                                           (Authorized Representative Title)

----------------------------------(Space Below This Line For Acknowledgments)----------------------------------

STATE OF OHIO              )
                          ) SS.
COUNTY OF MONTGOMERY  )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _____,

_____(Title) of National City Mortgage Co., an Ohio Corporation (Lender), who

acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said

Corporation and his/her free act and deed personally and as such officer.

IN WITNESS WHEREOF, I have hereunto set my hand, this _____ day of May, 2009.


_____
Notary Public

My Commission Expiration Date is:_____

Witness: _____

_____ (Seal)
**MICHAEL J DOWNEY**        Borrower

Witness: _____

_____ (Seal)
**CONNIE DOWNEY**           Borrower

Witness: _____

_____ (Seal)
                            Borrower

Witness: _____

_____ (Seal)
                            Borrower

State of __NC__

County of __Yancey__

On __June 12, 09__ , before me, __Heather M Silvers__ (notary public), personally

appeared **MICHAEL J DOWNEY SR JOINT TENANCY CONNIE DOWNEY** , (Borrowers) who proved to me

on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and

acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by

his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted,

executed the instrument.

(If acknowledged in the State of California, the following also applies:

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true

and correct.)

WITNESS my hand and official seal.

Notary Public

My Commission Expiration Date is: __10-26-2013__

(NOTARY PUBLIC SEAL)



# NOTE

February 9 , 2007                    BURNSVILLE                    NC

[Date]                                   [City]                         [State]

COXES CREEK ROAD, BURNSVILLE, North Carolina 28714

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $        650,000.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is
   **National City Mortgage a division of National City Bank**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate
of        8.000       %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

## 3. PAYMENTS

   **(A) Time and Place of Payments**

   I will pay principal and interest by making a payment every month.

   I will make my monthly payment on the   **1st**     day of each month beginning on   **March 1 , 2008**        . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on   **February 1, 2038**            , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

   I will make my monthly payments at       **National City Mortgage Co.**
   **PO Box 533510, Atlanta, GA   30353-3510**           or at a different place if required by the Note Holder.

   **(B) Amount of Monthly Payments**

   My monthly payment will be in the amount of U.S. $        4,769.47 .

## 4. BORROWER'S RIGHT TO PREPAY

   I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.

   I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to
the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the
Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the
Note Holder agrees in writing to those changes.

**MULTISTATE FIXED RATE NOTE**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

Wolters Kluwer Financial Services        Form 3200 1/01
VMP®-5N (0207).01
Page 1 of 3

Initials: MD CS.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be         4.00      % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
MICHAEL J DOWNEY SR          -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

*[Sign Original Only]*

VMP®-5N (0207).01                    Page 3 of 3                    Form 3200 1/01



## CONSTRUCTION/PERMANENT ADDENDUM
## TO FIXED RATE NOTE
### (with Capped/Float Down)

**THIS CONSTRUCTION/PERMANENT ADDENDUM TO FIXED RATE NOTE** is made this __9th__ day of __February    2007__ and is incorporated into and shall be deemed to amend and supplement the Fixed Rate Note (the "Note") of the same date given by the undersigned (the "Borrower") to evidence payment of Borrower's obligations under the Note to __National City Mortgage__ __a division of National City Bank__ (the "Lender") of even date herewith. Any terms not defined in this Addendum shall have the same meaning as in the Note and/or Construction/Permanent Loan Agreement.

ADDITIONAL COVENANTS. In addition to the covenants, agreements and obligations set out in the Note, Borrower and Lender further covenant and agree as follows:

1.      Borrower and Lender have executed a Construction/Permanent Loan Agreement of even date herewith. The terms of said Construction/Permanent Loan Agreement are incorporated herein by reference.

2.      Borrower, as owner, will construct Improvements in accordance with the plans and Specifications set forth in the Construction/Permanent Loan Agreement.

3.      The Note states that Borrower will make monthly payments of principal and interest on the dates set forth therein. Borrower agrees that during the Construction Period of the Improvements as set forth in the Construction/Permanent Loan Agreement, interest only will be charged at the rate of __9.250__% on the amounts actually disbursed and outstanding on the Note. The interest rate may change in accordance with this Section 7. Borrower agrees to make payments of interest only on the first (1st) day of every month beginning the (1st) day of the month following the first disbursement of the proceeds of the Note. Upon completion of the Improvements, Borrower agrees that interest only payments will be charged through the later of either the last day of the month in which the final disbursement was made or until the last day of the month in which Borrower elects to "lock-in" the Current Rate. If Borrower fails to complete construction of the Improvements prior to the Initial Completion Date Borrower agrees upon Lender's request to execute a Construction/Permanent Extension Agreement, pay any applicable charges and Borrower agrees that the rate during construction shall be increased to __11.75__% at Lender's sole discretion.

The Current Rate is the rate of interest quoted daily by Lender for Lock-in period of Forty-five (45) days or greater not to exceed Seventy-five (75) days.

The Capped Rate is the mortgage rate as quoted by Lender on the day of Borrower's interest rate lock for loan plus __0.875__%. The rate of interest effective after the Construction Period will not be greater than the Capped Rate provided the Construction is completed before the Initial Completion Date.

At any time during the "Lock-in Period", which is the thirty (30) day period prior to the earlier of completion of the construction of the Improvements or __1/31/2008__, _____, Borrower may elect to choose or "lock-in" the Current Rate. If Borrower elects the Current Rate, the Current Rate shall be the rate of interest payable beginning after the Construction Period. If Borrower does not elect to choose or "lock-in" a Current Rate during the Lock-in Period, interest will be charged at __11.75__% following the Construction Period.

4.      Borrower agrees that upon completion of the Improvements, Borrower will execute a modification agreement setting forth the interest rate, payment amount, and due date of payments for the period of the loan following the Construction Period. Should the Modification Agreement not be executed for any reason the interest rate on the unpaid principal being charged shall be increased to __11.75__%.

5.      All other terms, conditions, and obligations set forth in the Note relative to payments remain unchanged.

CPFIX31                                                                 (12/04)

6.      With the exception of the interest rate applicable to the loan following the Construction Period, Borrower agrees that this Construction/Permanent Loan Addendum to Fixed Rate Note will be null and void at the time the loan is sold in whole or part to Federal National Mortgage Association, Government National Mortgage Association, Federal Home Loan Mortgage Corporation or any other purchaser which so requires.

7.      Variable Interest Rate and Monthly Payment Changes

(A) The Index

Prime Rate as published in the Wall Street Journal.  Each date on which my variable rate could change is called a "Change Date".

(B) Calculation of Changes

My rate will increase and decrease according to the changes in Prime Rate as published in the Wall Street Journal.  This amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment be charging the new interest rate on unpaid principal.  The result of this calculation will be the new amount of my monthly payment.

My new interest rate will become effective on each Change Date.  My interest rate may change more than once a month.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

9.      Borrower's Failure to Pay As Required

(A) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(B) Disbursements

If I have past due interest on the account, I understand no further disbursements will be made until I pay my past due interest.

(C) Final Interest

If I do not pay the full amount of the Final Interest Invoice on the construction loan, I understand that my first mortgage payment shall be applied first towards delinquent interest with the remainder being placed in escrow, until a full payment has been received.  This may cause your mortgage loan to become delinquent.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Construction/Permanent Addendum to Fixed Rate Note.

_____ (Seal)          _____ (Seal)
Borrower   MICHAEL J DOWNEY SR                              Borrower

_____ (Seal)          _____ (Seal)
Borrower                                                          Borrower

CPFIX32  (Updated 12/04)

FILED in YANCEY County, NC
Feb 12 2007 at 02:49:05 PM
by: WILLOREE JOBE
REGISTER OF DEEDS
BOOK546 PAGE519 to 537

# DEED OF TRUST

L.W.H— Downey (NH)

Return To:   National City Bank
             P.O. Box 8800 Dayton, OH 45401-8800

Prepared By: **CLAUDETTE HUSSEY**

             National City Bank
             P.O. Box 8800 Dayton, OH 45401-8800
✓ Prepared By: Jack L. Wilson, Jr., Attorney at Law, P.O. Box 457,
             Burnsville, North Carolina 28714-0457

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated   **February 9, 2007**
together with all Riders to this document.

(B) "Borrower" is

MICHAEL J DOWNEY SR Joint Tenancy CONNIE DOWNEY

Borrower is the trustor under this Security Instrument.

(C) "Lender" is National City Mortgage a division of
National City Bank
Lender is a   National Banking Association
organized and existing under the laws of   United States

**NORTH CAROLINA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3034 1/01

VMP®-6(NC) (0510)
Page 1 of 15          Initials: *MD CD*
    VMP Mortgage Solutions, Inc. (800)521-7291



BOOK 546 PAGE 520

Lender's address is   **3232 NEWMARK DRIVE, MIAMISBURG, OH  45342**

Lender is the beneficiary under this Security Instrument.

**(D) "Trustee" is**   A. Grant Whitney

**(E) "Note"** means the promissory note signed by Borrower and dated   **February 9, 2007**
The Note states that Borrower owes Lender
    **SIX HUNDRED FIFTY THOUSAND & 00/100**                            Dollars
(U.S. $      **650,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   **February 1, 2038**      .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify]**CONST PERM RDR** |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

BOOK 546 PAGE 521

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the        County        of        Yancey        :

[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE ATTACHED EXHIBIT A FOR LEGAL DESCRIPTION MADE A PART HEREIN

Parcel ID Number:        which currently has the address of

COXES CREEK ROAD,        [Street]
BURNSVILLE        [City], North Carolina        28714        [Zip Code]
("Property Address"):

TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any

VMP-6(NC) (0510)        Page 3 of 15        Initials: MD CD.        Form 3034  1/01

BOOK 546 PAGE 522

prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 then Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

Initials: *NB CD.*

BOOK 546 PAGE 523

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be   in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded;

BOOK 546 PAGE 524

or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest

BOOK 546 PAGE 525

or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

BOOK 546 PAGE 526

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:



(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

BOOK 546 PAGE 528

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

BOOK 546 PAGE 529

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other

BOOK 546 PAGE 530

than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**BOOK 546 PAGE 531**

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5 % of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** Attorneys' fees must be reasonable.

Initials: _MCl_

BOOK 546 PAGE 532

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        MICHAEL J DOWNEY SR          -Borrower

_____        _____ (Seal)
                                        CONNIE DOWNEY                 -Borrower

_____ (Seal)  _____ (Seal)
                      -Borrower                                -Borrower

_____ (Seal)  _____ (Seal)
                      -Borrower                                -Borrower

_____ (Seal)  _____ (Seal)
                      -Borrower                                -Borrower

BOOK 546 PAGE 533

**STATE OF NORTH CAROLINA,**                                    YANCEY          County ss:

   I,    SHANDRA Y. PETERSON

a Notary Public of the County of        YANCEY                          , State of North Carolina, do hereby

certify that      MICHAEL J. DOWNEY, SR. and CONNIE DOWNEY

who is/are known to me or proved to me on the basis of satisfactory evidence to be the person(s) described,
personally appeared before me this day, each acknowledging to me that he/she/they voluntarily signed the
foregoing instrument for the purpose stated therein, and in the capacity indicated.

   Witness my hand and official seal this          9th            day of February 2007

   My Commission Expires:  10/25/2007

_____
Notary Public

**STATE OF NORTH CAROLINA,**                                                    County ss:

   The foregoing certificate of

a Notary Public of the County of                          , State of

is certified to be correct.

   This                      day of

_____
Registrar of Deeds

By _____
   Deputy Assistant

Initials: _____

BOOK 546 PAGE 534

EXHIBIT "A"

Being that certain tract or parcel of land lying and situated in Jacks Creek Township, Yancey County, North Carolina and being more particularly described as follows:

BEGINNING on a set iron pin in the line of Elmer B. Gedeon (Deed Book 538, Page 715, Yancey County Registry), the same being located 8.45 feet from a found iron pin, and running N 70 37 58 E 90.16 feet to a set nail in the line of Jessie Bailey and the center of Coxes Creek Road (SR 1354); thence with the center of Coxes Creek Road the following courses and distances: S 29 57 50 E 107.06 feet, S 32 03 39 E 82.70 feet, S 33 31 31 E 66.73 feet, S 35 00 02 E 65.59 feet, S 37 23 55 E 65.47 feet, S 40 00 15 E 62.04 feet, S 43 17.44 E 43.06 feet set nail; thence leaving Coxes Creek Road and with the line of Mark Thomas et. ux. (Deed Book 315, Page 162, Yancey County Registry) S 51 05 18 W 21.53 feet to a found 1/2 inch pipe, S 51 05 18 W 206.37 feet to a found 1/2 pipe, corner of Harold Black (Deed Book 459, Page 142, Yancey County Registry; thence with the Black line S 51 05 18 W 5.15 feet to a set iron, located 11.15 feet from a found pipe, and continuing with the Black line S 48 34 55 W 232.47 feet to a set iron pin, S 80 23 26 W 427.32 feet to a found 1/2 inch pipe near a small branch, S 09 03 43 W 70.50 feet to a set iron, S 05 25 37 E 153.17 feet to a set iron, S 02 59 58 W 36.06 feet to a set iron, S 19 58 07 W 139.06 feet to a 24-inch poplar, S 20 46 17 W 92.59 feet to a set iron, S 32 04 35 W 100.84 feet to a set iron, S 32 04 35 W 40.00 feet to a 60-inch twin chestnut oak on a ridge line, corner of Madlyn Bailey (Deed Book 256, Page 458, Yancey County Registry); thence with the ridge and the Bailey line N 80 41 22 W 120.57 feet to a set iron, S 74 35 00 W 67.41 feet to a 4-inch black gum, S 59 56 33 W 81.77 feet to a set iron in the line of Lloyd Bailey et. ux. (Deed Book 315, Page 626, Yancey County Registry), the same being located N 03 44 43 E 395.11 feet from a 24-inch white oak (terminus of the 13th call in Deed Book 315, Page 626, Yancey County Registry); thence continuing with the ridge and the Lloyd Bailey line N 45 56 12 W 222.92 feet to a 12 inch found pipe, N 66 02 57 W 102.58 feet to a 24-inch red oak (found hacked), N 82 33 25 W 209.62 feet to a set iron, N 46 23 40 W 208.29 feet to a set iron, N 89 04 41 W 208.29 feet to a set iron, N 56 17 33 W 193.24 feet to a set iron, corner of Lloyd Bailey (Deed Book 135, Page 372, Yancey County Registry); thence with the ridge and the Bailey line N 39 04 14 W 88.79 feet to a nail set in the base of a 20-inch locust, corner of Lloyd Bailey et. al. (Deed Book 289, Page 147, Yancey County Registry); thence a new line N 81 05 23 E 1,752 feet to a set iron, N 14 10 01 E 565.22 feet to the point of BEGINNING, containing 20.22 acres, according to a map and plat of a survey by Leadbitter Land Surveying, PLS, L-4427, dated 23 January, 2007 and being File No. RH-05005-01C.

THIS CONVEYANCE IS SUBJECT TO the right of way for Coxes Creek Road (SR 1354) to its full legal width.

THIS CONVEYANCE IS SUBJECT TO all easements, rights of way, or restrictions as may be apparent from a visual inspection of the property.

BOOK 546 PAGE 535

**THIS CONVEYANCE IS SUBJECT TO** the cemetery located upon the above-described property and the rights of others to access the same.

**AND BEING** the same identical property appearing in Deed Book 508, Page 159, Yancey County Registry.

BOOK 546 PAGE 536

## CONSTRUCTION/PERMANENT RIDER

**THIS CONSTRUCTION/PERMANENT RIDER** is made this 9th day of February , 2007 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to

National City Mortgage a division of
National City Bank

(The " Lender") of the same date and covering the property described in the Security Instrument and known as:

COXES CREEK ROAD, BURNSVILLE, North Carolina 28714
Yancey

(Property Address Including County)

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security Instrument and Note,                                                           Borrower and Lender further covenant and agree as follows:

1. Borrower and Lender have executed a Construction/Permanent Loan Agreement of even date. The terms of said Construction/Permanent Loan Agreement unless otherwise stated are incorporated herein by reference.

2. Borrower as owner, will construct a residence in accordance with the plans and specifications set forth in the Construction/Permanent Loan Agreement on the real property described in the Security Instrument.

3. Construction of the residence set out above shall be completed on or before _____1/31/2008_____ , . If construction is not completed on that date, upon request of Lender, Borrower agrees to execute a modification agreement in form and substance satisfactory to Lender.

4. Borrower agrees that during the time of the construction of the Improvements as set forth in the Construction/Permanent Loan Agreement, interest only will be charged on the amounts of the Loan actually disbursed. Upon completion of construction of the Improvements, but in any event no later than 1/31/2008, _____, whether or not the construction of the Improvements is completed, Borrower agrees to make payments of principal and interest set forth in the Note.

5. Borrower agrees that the proceeds of the loan evidenced by the Note will be disbursed pursuant to the Construction/Permanent Loan Agreement and Borrower further agrees to provide Lender with all documentation required under the Construction/Permanent Loan Agreement prior to requesting any disbursement.

6. Borrower agrees that this Construction/Permanent Rider will be null and void upon completion of the construction of the Improvements and/or the beginning of the amortization of principal as set forth in the Note and in any event at the time the loan is sold in whole or in part to Federal National Mortgages Association, Government National Mortgage Association, Federal Home Loan Mortgage Corporation or any other purchaser which so requires.

NCM Form 1138 CONSTS1                                                                                    (12/04)

BOOK 546 PAGE 537

**BY SIGNING BELOW**, Borrower accepts and agrees to the terms and covenants contained in this Construction/Permanent Rider.

_____ (Seal)        _____ (Seal)
MICHAEL J DOWNEY SR          Borrower        CONNIE DOWNEY            Borrower

_____ (Seal)        _____ (Seal)
                             Borrower                                Borrower

## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Case No.  10-10939 |
| | ) | |
| MICHAEL J. DOWNEY | ) | |
| CONNIE L. DOWNEY | ) | NOTICE OF |
| SSN:  xxx-xx-6261 | ) | OPPORTUNITY FOR HEARING |
| SSN:  xxx-xx-5117 | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| DEBTORS | ) | |

TAKE NOTICE that an application or motion has been filed by Kondaur Capital Corporation, its successors and/or assigns, as their respective interests may appear. A copy of the application or motion accompanies this Notice.

TAKE FURTHER NOTICE that any response, including objection, to the relief requested in the attached application or motion, should be filed with the Clerk of the Bankruptcy Court within fourteen (14) days of the date of this Notice and a copy served on the attorney identified below and upon other parties as required by law or court order.  Any response shall clearly identify the specific motion or application to which the response is directed.

TAKE FURTHER NOTICE that no hearing will be held on this motion or application unless a response is timely filed and served, in which case, the court will conduct a hearing on June 21, 2011, at 9:30 AM at Asheville, North Carolina.  No further notice of this hearing will be given.

This the 18th day of May, 2011.

THE LAW FIRM OF HUTCHENS, SENTER & BRITTON, P.A.

BY:   s/Joseph J. Vonnegut_____
JOSEPH J. VONNEGUT
Attorney for Movant
4317 Ramsey Street
Post Office Box 2505
Fayetteville, NC 28311
(910) 864-2668
State Bar No. 32974

THIS IS A COMMUNICATION FROM A DEBT COLLECTOR.  THE PURPOSE OF THIS COMMUNICATION IS TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Address of Court:
United States Bankruptcy Court
100 Otis Street
Room 112
Asheville, NC  28801-2661

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this date this paper was served upon the following parties by depositing a copy enclosed in a postpaid, properly addressed wrapper in a post office or official depository under the exclusive care and custody of the United States Postal Service or via the appropriate electronic servicer:

Debtors:
Michael J. Downey
107 New View Drive
Burnsville, NC 28714

Connie L. Downey
107 New View Drive
Burnsville, NC 28714

Attorney for Debtors:
Edward C. Hay, Jr.
137 Biltmore Avenue
Asheville, NC  28801

David G. Gray
Chapter 13 Trustee
81 Central Avenue
Asheville, NC  28801

This the 18th day of May, 2011.

THE LAW FIRM OF HUTCHENS, SENTER & BRITTON, P.A.

BY:   s/Joseph J. Vonnegut_____
JOSEPH J. VONNEGUT
Attorney for Movant
4317 Ramsey Street
Post Office Box 2505
Fayetteville, NC 28302
(910) 864-2668
State Bar No.  32974

HSB Case No:  1042030 (BK)